TOWNSHIP OF MERIDIAN *v.* CITY OF EAST LANSING.

MUNICIPAL CORPORATIONS—TOWNSHIPS—WATER RATES—STATUTES.
    Decree dismissing bill by plaintiff township to enjoin defendant city from charging rates for water supply furnished pursuant to contract providing for rates that are reasonable in relation to cost but which were not beyond twice the rates of city's residents, is affirmed (CL 1948, § 123.141).

CARR, C. J., and REID and KELLY, JJ., dissenting.

Appeal from Ingham; Coash (Louis E.), J. Submitted January 12, 1955. (Docket No. 49, Calendar No. 46,384.) Decided June 29, 1955.

Bill by Township of Meridian, Ingham County, a municipal corporation, against City of East Lansing, a municipal corporation, and John M. Patriarche, as City Manager, to enjoin collection of increased water rates. Bill dismissed. Plaintiff appeals. Affirmed.

*Fred C. Newman,* for plaintiff.

*Charles E. Chamberlain* (*Russell A. Searl,* of counsel), for defendants.

---

REFERENCES FOR POINTS IN HEADNOTES
56 Am Jur, Waterworks §§ 27, 28; 43 Am Jur, Public Utilities and Services § 104.

Reid, J. (*dissenting*). Plaintiff filed a bill of complaint to enjoin defendant city from charging and collecting increased rates for supply of water, and appeals from a decree of the circuit court in chancery dismissing the bill. On November 10, 1949, plaintiff township entered into a written agreement with defendant city providing for the sale of water by the defendant city to plaintiff for a period of 10 years from the time plaintiff had established a water-distribution system. A meter for water furnished plaintiff was installed June 7, 1950, apparently the approximate date when such distribution system was completed by plaintiff.

A greatly increased new rate was demanded by the city on March 16, 1953. It is because of this new rate that the instant suit was instituted by the plaintiff. The agreement in question of November 10, 1949, in paragraph 5 contains the following:

"For all water delivered by the city to the township under this agreement, the township agrees to pay the prescribed rates which shall from time to time be established by the city; however, such rates shall always be reasonable in relation to the costs incurred by the city for the supply of water. Bills for all water delivered hereunder shall be rendered to the township at regular intervals, and shall be payable on or before the due date shown thereon. There shall be an additional charge of 20% attaching to and to be collectible on all bills not paid on or before due date."

The above contract was for a period of 10 years and was subject to termination by either party upon written notice to be given 2 years before the expiration date, which provision was modified by the parties by an agreement dated July 6, 1953, containing the following:

"It is mutually agreed that the agreement of the 10th day of November, 1949, shall continue in full

force and effect as to all other conditions, terms and provisions for a period of 30 days after such time as the township shall give written notice to the city that the township has developed its own source of water supply; provided, however that the agreement of November 10, 1949, as modified, shall continue in effect a minimum period of 1 year from and after the execution of this instrument but in no event beyond the 10th day of November, 1959."

By ordinance No 29 of the city council, adopted before the contract in question, charges for water services for premises outside the city were fixed at not less than the same rate at which such services were furnished to premises inside the city. Nonresidents by later resolution would not be entitled to the discount of 20% authorized for residents in the city. By a resolution of the city council adopted on June 20, 1949, such charge to nonresident users was further modified to impose a 20% penalty upon bills paid after the due date thereof.

Due to the fact that nonresidents were not permitted the 20% discount, they actually paid 125% of the net rate paid by customers (in the city) who took advantage of such discount. The cost to the city as determined by its auditor of producing water for its customers during the fiscal year 1949 was 35.02 cents per thousand gallons and for the fiscal year of 1950 was 38.84 cents per thousand gallons. At the time of the trial the township was taking 9.3% of the entire volume of water produced by the city. The city has a maximum capacity to pump 2,750,000 gallons per day. That capacity was being approached as on July 2, 1952, the city pumped 2,428,000 gallons. The city claims it was reaching the "saturation point," i.e., limit of capacity to supply to resident customers and water users of the city. The city manager, defendant Patriarche, has made no definite plans for immediate expansion of

the pumping capacity by the city. City officials estimated that unless the contract was sooner terminated, future expansion of the city's facilities (for furnishing water) would be required at some point, depending upon actual growth, occurring between 3 to 6 years, and that the cost incident to adequate increase of its pumping capacity, by one additional well of 500 gallons per minute, would be $64,115.

Plaintiff's witness, Professor Frank Theroux, testified on direct examination:

"To allow for a little leeway and variation in costs that may occur in the future, if I were making a recommendation to East Lansing at present, I probably would recommend that the rates for all concerned, all users of water, be increased 10% approximately."

The city by resolution adopted March 16, 1953, determined its charges for water service on and after May 1, 1953, outside of the city "shall be made at 150% of the respective rates set forth in section 12 of ordinance No 29 of the city of East Lansing as heretofore or hereafter amended for water service to premises inside of the city."

On April 29, 1953, representatives of the city informed representatives of the township that the city had adopted a policy of placing the charge to a user outside the city at 150% of the city user's charge.

The court found "the city has a right by statute to charge not less than 100% nor more than 200% to users of water outside of the city limits." This has, apparently, reference to CL 1948, § 123.141 (Stat Ann 1949 Rev § 5.2581), which is as follows:

"Municipal corporations having authority by law to sell water outside their territorial limits, hereinafter referred to as corporations, may contract for such sale with cities or villages having authority

to provide a water supply for their inhabitants, but the price charged shall not be less than nor more than double that paid by customers within their own territory."

This statute has no reference to customers in *townships* as the outside territory, but only to users in outside cities or villages, and therefore is no command to the parties in this case; it is of slight use and that only by analogy, in this case. It is to be noted that the statute does not forbid an *agreement* by the parties that the users residing outside the supplying municipality shall pay the same rate as users resident in the supplying municipality. An agreement anywhere within the 100% and 200% is permissible so far as the statute is concerned, even where it is applicable.

Franklin Gregg, Jr., a certified public accountant, was employed by defendant city to audit its books and records in connection with the operation of its water and sewage utility. He testified:

"Exhibit 23 is a comparative summary of the operations of the water department for the 5 years ended June 30, 1953. * * * The first point * * * as far as the water department is concerned, certain direct costs as far as the sewerage department is concerned, have been segregated as a bookkeeping operation. Now, these specific expense, customer accounting and collection costs, administrative and general expenses, and transportation costs, were not segregated as a particular departmental cost because of the bookkeeping problems involved there, but were shown in reports as a cost of both departments and deducted from the gross operating profits of the combined 2 departments.

"So, to attempt to pull out in this summary statement here the cost of the water utility as such, we had to have some basis for pro rating customer accounting and collection costs, administrative and general expense, and transportation costs.

"Now, there are probably several methods that you could use in segregating these costs. The one that I felt did the best job was to take the total revenue of the 2 departments combined, take the revenue of the water department, and take that percentage relationship times each of these particular costs."

The city furnishes no sewerage service to the township and only furnishes water, but charges for sewerage services were commingled by defendant city with water charges.

The plaintiff of course could not keep books for the city of East Lansing respecting the cost of the city's water service. The books and records of East Lansing do not show, even within a fair degree of accuracy, the basis for determination of the reasonableness of the increase in charges complained of for water supplied.

While it may be said that the plaintiff under ordinary circumstances would have the burden of proving the unreasonableness of the charges fixed by defendant city, yet when the defendant city after a period of more than 3 years had elapsed, was and still is leaving its accounts in a shape where its own witness finds sewerage and water charges so commingled that a precise statement of the costs of production of water is unascertainable, under such circumstances the city, in sole charge of keeping its own accounts, should be considered as required to prove the reasonableness of its own charges.

The inclusion of sewerage costs in charges against plaintiff would require that the rates fixed by the city be enjoined.

All that plaintiff should pay toward retirement of bonds issued for the cost of the establishment of the city's water plant must be considered as included only to an amount equal proportionately to the charges required of East Lansing users. No addi-

tional amount should be required of plaintiff which at no time has been nor shall be a part owner of the plant.

Ordinance No 29 of the city of East Lansing in effect at the time the contract was signed, November 10, 1949, contains among other things the following in section 12:

"Except as herein otherwise provided, water to be furnished by the system to each premises shall be measured by a meter installed and controlled by the city. Charges for water service to each premises within the city connected with the water-supply system, for each quarterly (3 months) period shall be as follows:

"For the first 3,000 gallons of water used, $1 per 1,000 gallons.

"For the next 3,000 gallons of water used, 50 cents per 1,000 gallons.

"For the next 14,000 gallons of water used, 30 cents per 1,000 gallons.

"For the next 30,000 gallons of water used, 24 cents per 1,000 gallons.

"For all over 50,000 gallons of water used, 20 cents per 1,000 gallons.

"The minimum quarterly (3 months) water charge to each premises within the city connected with the water-supply system shall be the sum of $3.

"Charges for water service to premises outside the city shall be fixed by the council, but shall be not less than those above set forth."

And further in said ordinance among other things section 16 recites as follows:

"The rates hereinbefore established are estimated to be sufficient to provide for the payment of the expenses of administration and operation of the system and such expenses for the maintenance therof as may be necessary to preserve the same in good repair and working order; to provide for the payment of the interest upon and the principal of all

bonds payable therefrom, as and when the same shall become due and payable, and for the creation of a reserve for the payment of principal and interest as required in this ordinance; and to provide for such other expenditures and funds for the system as are required by this ordinance."

The defendant is estopped by its own ordinance from including items or classes of items not set forth in the ordinance, as grounds for computing costs.

Plaintiff, in effect, disclaims knowledge of the existence of this ordinance at the time of entering into the contract sued on. Defendant's counsel claim that plaintiff knew about ordinance No 29 when the contract was entered into. The contract does not recite any acceptance by plaintiff of the grounds for rates set forth in ordinance No 29.

In any event, the city is required to observe its own ordinance, and, even though it be assumed that the township before the making of the contract sued on, knew of the existence of ordinance No 29 and acquiesced in the classes of costs of production of water in that ordinance in making the contract, and that the subsequent actions of the city and township occurred in recognition of the ordinance and of the grounds set forth in section 16 of ordinance No 29 for the establishment of rates, including expenses of administration, operation of the system and maintenance, the interest upon and principal of all bonds payable therefrom as and when the same shall become due and payable, and for the creation of a reserve for the payment of principal and interest and to provide for such other expenditures and funds for the system as are required by the ordinance, still the rates are required by the contract to "be reasonable in relation to the costs incurred by the city for the supply of water."

An insufficient excuse for a violator of a plain contract is to assert that he does not know what

the contract means. The wording of the contract in the instant case is fairly clear. The contract certainly includes the meaning that the rates are to be based on reasonable grounds for costs reasonably computed. The contract surely means that Meridian is to pay its proportionate share of reasonable costs reasonably computed and considered. If Meridian is required to pay charges for rates greater than rates paid by users living in East Lansing, that necessarily means that Meridian is to pay part of the charges for water supplied to East Lansing users. The words, "for the supply of water," mean water supplied to Meridian, not water supplied to East Lansing.

The defendant city had no right to fix rates for Meridian which shall require Meridian to pay more than the actual cost of the supply of water to Meridian. The water produced for East Lansing is commingled with that produced for Meridian. Hence, the cost of production requires apportioning. There is practically no other way to fix cost of supply to plaintiff. Meridian should pay no more than its proportionate share, adding thereto the extra cost of getting Meridian's share delivered to Meridian. Added cost for plaintiff's share for reading plaintiff's meter was practically nil ($5 per year).

It is the duty of East Lansing to fix rates that will pay the reasonable costs, and Meridian is to pay only the cost of water supplied to Meridian. To charge Meridian rates that are greater for the water supplied to Meridian than the rates charged to East Lansing users is violative of the terms of the contract, for the reason that it costs East Lansing less per 1,000 gallons to supply Meridian with water than the cost to supply the East Lansing users per 1,000 gallons. All users were of the total number of 2,554, and only a very few users are outside of East Lansing.

Meridian is a large customer.  Mr. Theroux gave the following testimony (which is not disputed):

"It is generally conceded that the cost of serving a customer that uses a relatively large quantity of water is less than the cost of serving a customer that uses a small quantity of water.  *  *  *  For a very small customer we have to establish a meter, maintain it, and we have to read the meter, and have other expenses in connection with billing and records, for a relatively small quantity of water; and in the case of a large customer who is using a relatively large quantity of water, those expenses that I mentioned are approximately the same, and so on that basis it justifies a considerable differential between the rates charged for small and large customers."

This is borne out by the hereinbefore recited provisions of ordinance No 29 in fixing lesser rates per 1,000 gallons for users of larger volumes.  In the instant case after the installation of a meter, a "box," and pipe for the connection, a total cost of $1,650, no construction by defendant was (nor has been since) necessitated by reason of the contract with plaintiff.

In addition, East Lansing is obliged to maintain a ramification of mains and pipes to supply more than 2,500 users in East Lansing but East Lansing is not required to pay for any maintenance for Meridian of pipes or mains beyond the location of the meter for Meridian.  The cost of the use of the meter for Meridian, according to the testimony of Mr. Patriarche, does not exceed $5 a year; it is only read 4 times in a year.

As before noted, by resolution adopted by defendant before the making of the contract, charges for outside users were fixed at the same rate as East Lansing users except outside users were not allowed the discount allowed East Lansing users.  This seems to have been understood by the parties as

a practical construction of the contract, for as hereinbefore recited, during the first 3 years that the parties operated under the contract sued on, plaintiff paid a rate equal to the rate charged East Lansing users but without the discount for prompt payment accorded East Lansing users, thus equal to 25% greater than users in East Lansing.

Mr. Patriarche testified that he believed expansion would be needed "within the next 3 to 6 years." With the contract in question having so few years yet to run, it would be unreasonable to charge Meridian for expansion not necessitated by reason of inclusion of Meridian's supply.

The practical construction of the contract established by charges fixed and collected by defendant city during the first 3 years (approximately) of operations under the contract with equal rates for plaintiff and East Lansing users, indicates that the parties themselves understood that the contract required the rates to be geared to cost of production and that rates for plaintiff should be equal with East Lansing users' rates. The denial of discounts for prompt payments supplied a margin favorable to the city, and sufficient to pay the $1,650 expense of connection with plaintiff's system.

It is beside the mark to quote from cases like *City of Detroit* v. *Village of Highland Park,* 326 Mich 78, where the relationships between the two municipalities were not governed by a contract of the same terms as the contract sued on in this case. Likewise, wholly inapt is the quotation as to charges in "an area of conflicting interests" with no contract like the contract sued on governing the conflicting interests as set forth in 101 U Pa Law Rev 160, 161, in which it is recited,

"Utility service is only one phase of a prevalent situation in which nonresidents adjacent to cities enjoy the economic and other advantages of city

life without being subjected to all the responsibilities of citizens."

This is clearly and absolutely outside of the test in the instant case of cost of water supply. The instant case is not a question of *ultra vires,* but of contract.

The contract in question is silent on matters of profit to the city. Profit to the city is excluded by the contract by the words, "such rates shall always be reasonable in relation to the costs incurred by the city for the supply of water."

Defendant's ordinance No 29 identified the various cost accounts; the meter identified plaintiff's share of the product. That the rates charged in 1950–1953 proved insufficient is no excuse for increasing plaintiff's *proportionate share* of cost. That other municipalities agree on higher rates for water supplied to outsiders is no excuse for defendant to violate its agreement with plaintiff by which defendant binds itself to require only reimbursement.

Defendant has the power but not the right to shut off Meridian's water supply. Fixing the rates for Meridian at 187–1/2% of charges to East Lansing users is like cracking a whip, not carrying out the agreement.

To repeat, the cost of supplying water to Meridian, a large user, is less than the cost of supplying East Lansing's more than 2,500 users per 1,000 gallons; East Lansing's accounts for water production are commingled with cost of sewerage service, thus making it not fairly possible to ascertain the cost of production of the water; the contract requires that Meridian shall pay only the reasonable cost of water supplied to Meridian; and the parties have given a practical construction to the contract during the course of nearly 3 years in which the rates paid by Meridian have been on an equal basis with the rates

charged to East Lansing users, except for the discount allowed East Lansing users. In view of the entire situation, the fixing of rates for Meridian at 187–1/2% (in all), of rates for East Lansing users, is a violation of the contract between the parties.

The decree appealed from should be reversed. An injunction should issue if found necessary restraining the city and its manager from collecting or attempting to collect, the enhanced charges, as fixed in 1953, and from refusing or neglecting to furnish water service as per the agreement, while the agreement is in force and plaintiff is not in default. Costs to plaintiff.

CARR, C. J., and KELLY, J., concurred with REID, J.

SMITH, J. I regret that I cannot agree with the result reached by my Brother.

This case turns on a very narrow point: Whether or not the rate charged to the township is "reasonable in relation to the costs incurred by the city for the supply of water."

In order that there may be a proper understanding of what the case involves, as well as what it does not involve, some perspective is necessary. We start with the proposition that, with respect to water and its supply, municipal ownership of water plants is common. Not only does the supply of adequate amounts of water often require large aggregations of capital, particularly when the water must be brought from a distance, but the service itself is intimately connected with problems of public health and protection. Thus Troxel's assertion, in his treatise on the "Economics of Public Utilities" (p 650), that in 1946 over 70% of the cities of over 5,000 population themselves provided the necessary water service is not surprising. Such service is not, in many cases, confined to the municipality owning

the plant. It is common, as in the case at bar, to find water sold to outlying fringe areas. At this point we get into an area of conflicting interests, described in 101 U Pa Law Rev, 160–162, in the following terms:

"Municipal ownership of a utility generates a conflict between economic and political considerations. The problem is common, since many cities sell utility service to nonresidents and most of these do so at higher rates. All the economic factors, such as the public need for the service, limited supply of a natural resource and wasteful duplication of facilities, which impose on a privately owned utility the duty of providing nondiscriminatory and reasonable rates to all consumers, recommend that the fact of city ownership should not alter this basic utility obligation. The court in the instant case* apparently felt these economic considerations to be controlling. However, other factors, more political in nature, are worthy of consideration. A city's purchase of a utility plant is made on behalf of its citizens, who then become both consumers and owners. The requirement of serving nonresidents at the same rates as residents partly defeats the purpose of the purchase by decreasing the benefit derived from the resident consumers' ownership. Utility service is only one phase of a prevalent situation in which nonresidents adjacent to cities enjoy the economic and other advantages of city life without being subjected to all the responsibilities of citizens. Thus in many instances cities serve fringe areas at the expense of the municipal taxpayers. The obvious solution to the problem is annexation of these fringe areas; the lever of higher utility rates might serve as a means of persuading nonresidents to favor annexation. In the meantime higher rates would relieve to some extent the burden on city residents incurred in supporting adjacent nonresidents in other ways.

---

* *City of Texarkana* v. *Wiggins,* 151 Tex 100 (246 SW2d 622).— REPORTER.

"To resolve both the economic and political considerations many States have made the extraterritorial sale of municipal utility service subject to rate regulation by the State public utilities commission. Thus the nonresidents are afforded protection against exorbitant rates, and the cities are allowed a fair profit from sales beyond their corporate boundaries."

We note in passing, that the Michigan legislature has clearly, with respect to cities and villages, resolved the competing considerations of exhorbitant rates versus fair profits in CL 1948, § 123.141 (Stat Ann § 5.2581), by providing that the rate charged such outside municipalities shall not be more than double the rate paid by consumers within their own territory. This statute, even if applicable, as to which I express no opinion, has not been offended. The rate charged is not alleged to be greater than double that charged East Lansing consumers within their own territory. Nor is the rate out of line in comparison with rates charged out-of-city residents by other Michigan municipalities. The ratio between in-city resident water rates and out-of-city resident rates in 22 cities reported on in the record were between 1 and 1–1/2, and in another 20 were between 1–1/2 and 2.

The contract between the parties provided, in part, as follows:

"5. For all water delivered by the city to the township under the agreement, the township agrees to pay the prescribed rates which shall from time to time be established by the city; however, such rates shall always be reasonable in relation to the costs incurred by the city for the supply of water."

The above provision must be considered in conjunction with section 12 of Ordinance No 29 of the city of East Lansing, Michigan, in effect at the date of the contract:

"Charges for water service to premises outside the city shall be fixed by the council."

There was thus placed, by the contract, a limitation upon the city's power to establish rates, namely, that they "shall always be reasonable in relation to the costs incurred by the city for the supply of water."

We are asked by the appellant to find that the rate charged is not reasonable as above prescribed. It will be noted that the clause under examination does not equate rates to costs. Identity is not required. Obviously there is elbowroom for adjustment. The requirement merely is that they shall be "reasonable" in relation to costs. The word "reasonable" with respect to rates charged by utilities is a word of the most universal employment. It may be provided by ordinance, statute, or constitution (*e.g. Simons v. City Council of Charleston*, 181 SC 353 [187 SE 545]) that rates shall be "reasonable," or "fair and reasonable." Moreover, should the question of rate arise on a contract implied in law, the judicial requirement is that the rate to be paid shall be "reasonable." *City of Detroit v. City of Highland Park*, 326 Mich 78, 100. It may also be employed (as in the case at bar) in a contract. The determination of its meaning, in any case, is not subject to mathematical computation with scientific exactitude but depends upon a comprehensive examination of all factors involved, having in mind the objective sought to be attained in its use. Here it is related to the costs incurred by the city in the supply of water.

At this point our examination becomes specific. The city submitted cost figures based upon 3 different methods of computation. The first was based upon the operating expenses of the water system, as shown by audit, with the allocation of the customer accounting and collection costs and the administra-

tive and general expenses between the water and sewage systems in proportion to the gross receipts of the 2 systems. Under this method of computation costs varied from 41.53 cents to 35.02 cents per 1,000 gallons.

The second method of computation is weighted in favor of the large consumer (*i.e.*, the township). This is accomplished by charging but 2/3 of the administrative and general expenses, which is, concededly, an arbitrary apportionment thereof. Added thereto is (a) return upon the depreciated capital investment of the system at the rate of 4% per annum, and (b) the cost of potential capital improvement for the system applicable to the township's needs. The result is a cost of 39.59 cents per 1,000 gallons.

The third method of computation differs from the second in that no charge is included for return on the capital investment of the system, but instead there is included 83.7% of the principal and interest requirements of the revenue bonds (allocable for water as distinguished from sewer requirements), and the entire interest and principal of the general obligation bonds outstanding against the water department. This method produces a cost per 1,000 gallons of 43.34 cents.

The township does not counter with final figures of its own. Nor does it complain that all charges made are improper. It contents itself with the challenge of items here and there in the cost figures produced by the city. Thus issue was raised as to the proper method of allocation of the undivided costs of the 2 systems, that is, the customer accounting and collection costs and the administrative and general expenses. The method employed by appellees, of dividing in proportion to the total income of the 2 systems, is, I find, not unreasonable. Appellant also argues that certain bond service charges

are not an item of cost because (1) when the contract was entered into, they were not considered as costs, and (2) the obligations were entered into prior to the contract and thereupon appellant's demand for water did not give rise to the charges. As to the first point, appellant misconceives the issue. The only question under the contract is whether or not the rates charged are reasonable in relation to costs, not whether the rates charged are reasonable in relation to what appellant believed the costs to be when the contract was executed. There has been no charge of fraud or deceit.

As to the second point, witnesses for both sides testified that cost computations should include charges for the retirement of both the general obligation bonds, issued for the sole purpose of the water system, and such portion of the revenue bonds as was allocated to the water system. While there is no direct testimony to this effect, it appears that the plaintiff's demands for water were partially met by supplying the water through the pipes, mains, and other appurtenances which were financed by the bond issues. The plaintiff makes use of the facilities for which the bond service charges must be met, and it is not unreasonable that it pay a share of such charges regardless of the fact that the construction of the facilities was not directly occasioned by plaintiff's demands.

As to the item including a fair return on the city's investment in the water plant which, appellant asserts, "is not a cost incurred by the city in any event," its inclusion was undoubtedly correct. We so held in *City of Detroit* v. *City of Highland Park, supra.* Prudent business administration requires that the item of costs incurred include, among others, operating expenses, upkeep of the property, and a fair return on the value thereof.

The item in the second of the alternative methods of cost computations pertaining to the cost of potential capital improvements stands on a footing less secure. Two questions arise with respect to such item, the first as to the imminence of the need of the improvement under contemplation, the second as to the source of the funds, whether bond issue or sinking fund. We need not, at this time, resolve such issues, since they are not, in themselves, controlling.

It would serve no useful purpose to discuss further, in this opinion, either the elaborate cost and worth analyses submitted to us through the diligence of counsel, or the accounting theories presented and argued. After all, we are not setting a rate. We are deciding merely whether a rate charged goes beyond a contract which requires that it be "reasonable in relation to the costs incurred by the city for the supply of water." As we noted, identity of rates with costs is not required. As a practical matter this would impose an impossible accounting task. The relationship need only be a reasonable one.

Is it? The case boils down to this: The township's own witness testified that in the fiscal year ending June 30, 1953, the city lost in producing the water approximately $7,000. The trial court concluded, with which conclusion I am in complete agreement, that the city has been supplying water to the township at a loss. It, then, with commendable business prudence, increased its rates, as, in my opinion, it was entitled to do under the contract. I believe that the rate charged (36.1 to 36.15 cents) is reasonable, not only with relation to the cost figures used by the auditor (35 cents–41 cents), but also with relation to the cost figures obtained by alternative theories of cost computation (36.59 cents–43.34 cents).

The burden of proof was on the plaintiff to show that the rates charged were, in fact, unreasonable with relation to costs. It has not done so. I find nothing unreasonable in the charges which the city seeks to make, charges which are permissible under the contract, which are well within good accounting practice, and which are, in fact, less than the maximum authorized by the legislature for similar fringe areas.

I find no merit in appellant's remaining assignments of error and affirm the trial court's dismissal of the bill of complaint. Costs to appellee.

SHARPE, BOYLES, and DETHMERS, JJ., concurred with SMITH, J.

BUTZEL, J., concurred in the result.