CITY OF PLYMOUTH v CITY OF DETROIT

Docket No. 72912. Argued March 7, 1985 (Calendar No. 10).—Decided
   November 8, 1985.

   The City of Plymouth and other municipalities brought an action
   in the Oakland Circuit Court against the City of Detroit Board
   of Water Commissioners and the Detroit Metro Water Depart-
   ment for breach of contract, alleging that a thirty-nine percent
   increase in the rate Detroit charged the municipalities for
   water violated water-service agreements between the plaintiffs
   and the city. Venue was transferred to the Wexford Circuit
   Court. The plaintiffs subsequently were certified as a class,
   representing seventy-six municipalities. The court, William R.
   Peterson, J., granted summary judgment for the defendants,
   finding that the use of the utility method of rate-making, by
   which the initial capital invested in a utility plant and capital-
   related expenditures are amortized and a return or profit on
   the investment is calculated, resulting in a determinable an-
   nual rate which allows recovery of the investment from future
   customers, and the employment of a differential rate of return
   favoring the owner-municipality was reasonable. The Court of
   Appeals, WAHLS, P.J., and M. J. KELLY and WARSHAWSKY, JJ.,
   reversed in an opinion per curiam, finding that the cost-of-
   capital method is the proper means of evaluating the reason-
   ableness of the rate of return, and remanded the case to the
   trial court with instructions to apply a cost-of-capital method
   by ascertaining the actual overall rate of return for each of the
   years contested, the debt to net investment ratio of the part of
   the system devoted to use for the plaintiffs, and the actual rate
   of return and the reasonableness of the rate. It further in-
   structed that if the rate at issue was found to be unreasonable,
   the trial court was to determine a reasonable rate (Docket No.
   61395). The defendants appeal.

      In a unanimous opinion by Justice BRICKLEY, the Supreme
   Court *held:*

      The statute empowering a municipality authorized to sell

---

REFERENCES FOR POINTS IN HEADNOTES

[1-4] Am Jur 2d, Waterworks and Water Companies, §§ 3 *et seq.* .
   See the annotations in the ALR3d/4th Quick Index under topic
   Water Supply § 2.

water outside its territorial limits to contract with other municipalities and to fix rates the municipalities will be charged does not provide the only standard which may be applied in determining the reasonableness of the rates. Contracts between the parties may provide a different, valid standard. The cost-of-capital method is not required as a matter of law to determine the reasonableness of the rate of return associated with a challenged municipal water rate. The burden of proof is on the challenger to establish that a water rate is arbitrary, capricious, or unreasonable and to justify application of an asserted standard of reasonableness whether provided by statute or by contract.

1. The statutory provision that a municipality authorized to sell water outside its territorial limits may charge other municipal customers within ten miles of its limits not more than twice the rate charged to resident customers and may charge municipal customers more than ten miles beyond its limits more than twice the resident customer rate where the rate charged bears a reasonable relation to the services rendered, does not provide the only applicable standard for determining the reasonableness of a rate. Rates which are not more than double the resident rate are not reasonable per se. Rather, the statutory limits provide only a ceiling of reasonableness. Agreements between the municipal seller and customers beyond its territorial limits which provide specifically that the rates charged are to be reasonable in relation to costs and which result in rates lower than the statutory ceiling may govern the relationship of the parties. Regardless of the statutory provisions, a municipal seller, by agreeing to such terms, limits its discretion with respect to setting rates.

2. The reasonableness of a rate charged by a municipal seller to other municipalities outside its territorial limits is a question of fact. The method used to determine reasonableness is not amenable to application of a fixed formula, but requires the exercise of discretion. In this case, the trial court found the rate to be reasonable. On the basis of the record, the conclusion was not clearly erroneous. The cost-of-capital method of determining the reasonableness of a rate of return might prove to be superior when applied in a case such as this; however, it is not required as a matter of law.

3. A rate charged by a municipality to supply water to other municipalities is assumed to be reasonable absent a showing to the contrary or a showing of fraud or bad faith or that it is capricious, arbitrary, or unreasonable. The burden of proof is

on the challenger to show that the rate is unreasonable with relation to costs. In this case, the plaintiffs failed to meet their burden.

Reversed.

130 Mich App 155; 344 NW2d 281 (1983) reversed.

1. MUNICIPAL CORPORATIONS — NONRESIDENT WATER RATES — REASONABLENESS.

The statutory provision that a municipality authorized to sell water outside its territorial limits may charge other municipal customers within ten miles of its limits not more than twice the rate charged to resident customers and may charge municipal customers more than ten miles beyond its limits more than twice the resident customer rate where the rate charged bears a reasonable relation to the services rendered, does not provide the only applicable standard for determining the reasonableness of a rate; rather, the statutory limits provide only a ceiling of reasonableness (1957 PA 53, MCL 123.141; MSA 5.2581).

2. MUNICIPAL CORPORATIONS — NONRESIDENT WATER RATES — REASONABLENESS.

Rates charged by a municipality for the sale of water to municipalities beyond its territorial limits which are not more than double the rate charged to residents are not reasonable per se; agreements between the municipal seller and its municipal customers which provide specifically that the rates charged are to be reasonable in relation to costs and which result in rates lower than the statutory ceiling may govern the relationship of the parties (1957 PA 53, MCL 123.141; MSA 5.2581).

3. MUNICIPAL CORPORATIONS — NONRESIDENT WATER RATES — REASONABLENESS.

The reasonableness of a rate for the sale of water charged by a municipality to other municipalities outside its territorial limits is a question of fact; the method used to determine reasonableness is not amenable to application of a fixed formula, but requires the exercise of discretion (1957 PA 53, MCL 123.141; MSA 5.2581).

4. MUNICIPAL CORPORATIONS — NONRESIDENT WATER RATES — REASONABLENESS.

A rate charged by a municipality to supply water to other municipalities is assumed to be reasonable absent a showing to the contrary or a showing of fraud or bad faith or that it is capricious, arbitrary, or unreasonable; the burden of proof is on

the challenger to show that the rate is unreasonable with relation to costs (1957 PA 53, MCL 123.141; MSA 5.2581).

*Milmet, Vecchio, Ward & Carnago* (by *George E. Ward*) and *Bert Burgayne* for the plaintiffs.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *Richard J. McClear, Kathleen McCree Lewis, Robert J. Franzinger,* and *Suzanne Sahakian*) (*Donald Pailen,* Corporation Counsel, of counsel) for the defendants.

BRICKLEY, J. This breach of contract action involving a 1976 thirty-nine percent water rate increase levied by the City of Detroit on ninety-five municipal customers outside the city requires us to pass on the method of determining whether the rates in question are "reasonable in relation to the costs incurred" and to consider the appropriate burden of proof and the standard of review to be applied to such a determination of reasonableness.

We conclude that MCL 123.141; MSA 5.2581 does not provide the only standard of reasonableness to be applied. In addition, we conclude that the Court of Appeals erred in finding that the so-called "cost of capital" method of determining the rate of return component of the water rate was necessary to establish a reasonable rate, in that such method is not required as a matter of law and the plaintiffs did not establish an evidentiary basis for such an analysis at trial. Finally, we find that the trial court properly placed the burden of proof on the plaintiffs to establish that the rates in question were unreasonable and properly found that the plaintiffs had not met that burden.

## BACKGROUND

Pursuant to the applicable constitutional, statu-

tory, and charter provisions,[1] the City of Detroit, through its Water and Sewerage Department (hereinafter DWSD), sells water at retail to its own citizens and at wholesale to some ninety-five sur-

---

[1] The 1908 Michigan Constitution, art 8, § 23 authorized cities and villages to "acquire, own and operate, either within or without its corporate limits, public utilities for supplying water, light, heat, power and transportation . . . without its corporate limits to an amount not to exceed 25 percent of that furnished by it within its corporate limits . . . ." A 1944 amendment of the section permitted such municipalities to sell and deliver water outside their corporate limits "in such amount as may be determined by the legislative body of the city or village . . . ." The same basic provisions are found today in Const 1963, art 7, § 24, except that the twenty-five percent limitation as to heat, power or light may be overridden by law, and outside-the-limits transportation is no longer subject to the twenty-five percent limitation but may be subject to limits "prescribed by law."

The constitutions since 1908 have also required the Legislature to provide for home rule. Const 1908, art 8, §§ 20, 21; Const 1963, art 7, §§ 21, 22. The Home Rule Act provides that "[e]ach city may in its charter provide . . . for the sale and delivery of water outside of its corporate limits in the amount as may be determined by the legislative body of the city . . . ." MCL 117.4f(3); MSA 5.2079(3). The Charter of the City of Detroit authorizes the sale of water outside the corporate limits of the city.

In addition, the version of MCL 123.141; MSA 5.2581 applicable during the years in question, 1917 PA 34, § 1, provided:

"Municipal corporations having authority by law to sell water outside their territorial limits, hereinafter referred to as corporations, may contract for such sale with cities, villages or townships having authority to provide a water supply for their inhabitants, but the price charged shall not be less than nor more than double that paid by consumers within their own territory. The price charged may be more than double that paid by consumers within their own territory if the water is delivered to a city, village or township lying outside the county within which the corporations are situated, and lying more than 10 miles beyond the territorial limits of the corporations. Any price charged that is more than double shall bear a reasonable relationship to the service rendered."

The current version of that statute was amended by 1981 PA 89 to provide that

"[t]he price charged by the city to its customers shall be at a rate which is based on the actual cost of service as determined under the utility basis of rate-making."

The statute as amended is inapplicable to this case.

rounding political subdivisions.[2] As these communities became Detroit water customers over the years, most[3] signed contracts that provide, as does the contract with the plaintiff City of Plymouth,[4] that

> [t]he City [of Plymouth] agrees to pay for all water supplied by the Board at such rates as the Board may establish from time to time, it being mutually understood that such rates shall always be reasonable in relation to the costs incurred by the Board for the supply of water.

In December, 1975, the DWSD recommended to the Detroit City Council that it raise the rates of all rate schedules to all customers by thirty-nine percent, effective May 1, 1976, and continuing through the 1980-1981 fiscal year. In support of

---

[2] The users outside the city administer the sale and distribution of the purchased water to their own citizens.

[3] Forty-five of the contracts in question contain the "reasonable in relation to the costs" language of the Plymouth contract. An additional twelve contracts contain that language, plus:

"and shall be comparable to the rates charged other public corporations or public agencies served by the DETROIT BOARD under like conditions."

Four of the contracts refer to "uniform rates," and two of the contracts merely require that the water will be available at "such price as shall be fixed, from time to time, by the said Board of Water Commissioners of the City of Detroit." The rate provision in the City of Flushing's contract provides that the

"rate of payment, by the City to the County, for all water delivered shall be two cents ($0.02) per 100 cubic feet greater than the amount per 100 cubic feet paid by the County to its water source for water."

Finally, the remaining four contracts parallel the relevant version of MCL 123.141; MSA 5.2581, providing that the price

"shall not be less than that charged to the citizens of Detroit, nor more than double that charged to the citizens of Detroit."

[4] Plaintiff's Exhibit A: Water Service Agreement City of Detroit—City of Plymouth.

this increase, the DWSD issued a report[5] in which it was noted that since the last increase in 1972, the cost of operation and maintenance had risen forty-three percent. This increase was due in large measure to a higher than usual inflationary spiral. The increase was also premised on increased debt reserve requirements and a five-year capital improvement program approximately seventy-five percent of which would be financed out of operating revenue.

It was basically a projection of those factors that led the city to estimate that it needed increased revenue in an amount equal to a thirty-nine percent across-the-board increase. There has been no challenge to these basic assumptions, and, in fact, there was general agreement by the parties that the projection of new revenue needs was conservative.

However, the parties are not in agreement over the allocation of the needed revenue between the resident customers and the plaintiff customers. In 1966, a study by a nationally known utility rate consulting firm, using the so-called "utility basis" method for allocating cost among customers, recommended a 10.1 percent increase in city rates and an 18.4 percent rate increase in out-city rates. Rather than follow the disparity rate allocation recommended in the 1966 rate allocation study, however, the city granted an across-the-board fifteen percent increase in 1967.[6] The next increase in 1972 was a flat twenty-three cent per unit across-the-board increase. Thus, since 1966, there have been, including the instant increase, three across-the-board increases, despite a recommended

---

[5] Plaintiff's Exhibit E: Report on Water Rates, DWSD.

[6] Plaintiff's Exhibit G: Memorandum from the Division of Research and Analysis to Council Members.

shifting of costs from Detroit users to out-city users.

The DWSD, in recommending this increase, evidently did not feel that there was a need for a reallocation of the cost of the system between the resident and out-city users. The staff report to the city council indicated that such an allocation study would take twelve to fourteen months and cost in excess of $125,000.

In May, 1976, the city council adopted the recommended five-year thirty-nine percent increase. Within two weeks, the plaintiffs[7] commenced this suit for breach of contract. The plaintiffs claimed that the new rates were "unreasonable, arbitrary and capricious and without proper foundation in fact or theory in that they do not clearly and adequately reflect a reasonable relationship of the costs incurred by the City of Detroit for the supply and distribution of water services to Plaintiffs, and . . . unreasonably discriminate between the rates charged the Plaintiffs . . . and the rates charged by the City of Detroit to [its users]." The complaint included two other counts: unjust enrichment based on unreasonably high rates of return on investment and violation of a provision of the Detroit City Charter requiring "equitable rates."

From the outset, the trial was focused on the plaintiffs' argument that a "differential" rate of

---

[7] The City of Plymouth, the City of Madison Heights, and the Greater Lapeer County Utilities Authority filed this suit

"for themselves and on behalf of all other municipalities, cities, towns and townships, and other public agencies and/or subdivisions similarly situated."

Plaintiffs were certified as a class by order on December 22, 1979. "[A]ny municipality which purchases water, directly or indirectly from Defendants and has been required to pay higher water rates as a result of the May, 1976 water rate increase" were deemed eligible to be included in the class. Seventy-six communities eventually "opted in" to the class.

return is improper. Plaintiffs' claim, essentially not denied by the city, is that a breakdown of the costs of furnishing water to the plaintiffs vis-à-vis the city users[8] shows the latter paying a negative rate of return on investment while the plaintiff users are paying approximately a nine percent rate of return.[9]

Although the issues in this case center on the rate-making of a municipally owned utility, many of the principles applicable in the private utility context are relevant here. The following comments by the trial court provide helpful background information regarding the rate-making process in Detroit.

> Rate-making procedures in Detroit have been similar historically to those of other cities, until recently having been carried out by department personnel according to their projections of demand and revenue needs, and without much reference to increasingly technical rate-making procedures employed in private enterprise utilities where considerations of owner investment and profit, and state regulations were involved. But the basic purposes of rate-making, (1) to provide enough revenue to meet costs, and (2) to structure rates to differing uses, are the same for both publicly and privately owned utilities. In the past 40 years, a host of economic, technological and demographic changes have complicated the accomplishment of both purposes, and minimized the differences between the rate-making procedures of publicly-owned and privately-owned utilities. It is not surprising, then, that both municipal utilities and their customers

[8] The water rate increase in question occurred in 1976, and plaintiffs filed suit May 24, 1976. However, the trial was not heard until May, 1980, and, therefore, by the time of trial, the actual expenses and costs for the first several years were available.

[9] The *rate* of return is achieved by dividing the return on investment by the "net plant" (original cost of plant less accumulated depreciation).

have utilized the services of engineering and financial consultants who have become expert in the art of utility rate-making.

In the early rate-making process, the first step of estimating the revenues needed to meet costs was the "cash basis" method which involved a projection of the cash needs of the utility for a given period, *i.e.,* the dollars needed to pay the expense of operation, meet debt obligations, and make such capital improvements as would not require bond financing, *e.g.,* limited new plant construction, plus recurring replacements, renovation and extensions of existing plant.

As municipal utility operations have become more complex and have borrowed from the experiences of privately-owned utilities, the so-called "utility method" of estimating revenue needs has evolved and is now the generally preferred method. It is different from the cash method in its handling of capital related expenditures; in place of annual estimates of cash flow therefor, which can vary widely from year to year, the utility method substitutes long term depreciation of, plus a return or profit on, the capital invested in the utility plant. This handling of capital related expenditures not only allows the amortization of such expenditures at a determinable annual rate over a period of time, but it also allows the recovery of initial capital investment from future customers, a particularly important consideration in an expanding system.

When the total revenue needs of the utility have been thus estimated, the estimated non-operating revenues of the utility are deducted, to determine the amount of money to be raised by charges for utility service, *i.e.,* the aggregate amount to be raised from differing rates charged to different classes of service.

The final, and most complicated, step in the rate-making process is the definition of different classes of user and the determination of the relative charges to be made therefor. While a variety of factors other than cost of service may be perti-

nent in determining rates for different classes of intra-city users, cost to the users is the framework around which the rate structure is constructed. For extra-city service, the cost thereof would seem to be *the* primary factor in rate determination. In practice, it does not appear that the city of Detroit has assigned any weight to any other factor in its extra-city rate determinations, although some contracts contain minimum quantity requirements.

The allocation of the estimated costs of the system as a whole between intra- and extra-city users may be undertaken in various ways. The two methods most widely used are the Demand-Commodity Method and the Base-Extra Capacity Method, described in Defendant's Exhibit P, *Water Rates*, 2d Ed., A Manual of Water Supply Practices, American Water Works Association, 1972. Each method attempts to allocate to the different customers a share of the operating and capital costs of the system fairly reflecting the kind of use the customer makes of the system. Each method involves a two-stage process, first attempting to allocate costs into two categories of service-cost functions, and then allocating those costs between customers according to their respective responsibility for each of the functional costs.

The expert witnesses for the parties, in retrospectively evaluating the reasonableness of the water rate in question, applied these various accounting methods to allocate the operating costs and plant capacity of the system between the city and out-city sectors of the water service.[10] After allocation, the experts used the utility-basis method to subtract from the rate charged to each sector its share of the operating costs and capital depreciation, leaving a figure for each sector that represented the "return on investment." It is this return on investment or, more properly, the resulting "rate of return," that is central to this appeal.

[10] There were some differences of opinion between the parties on cost allocation which are not relevant to the issues here.

While there were percentage differences between the findings of the experts, the trial judge "estimate[d] that . . . [the rate of] return would be between eight and nine percent annually [for out-city users], and that the differential between the negative intra-city return and the extra-city return would not be less than 13% in the best year and perhaps as much as 18% in the worst year." Thus, while this suit began over the amount of an across-the-board increase that made no attempt to disturb the then-existing allocation of the revenue burden between the resident and out-city users, it has obviously shifted to a contest over the distribution of the revenue burden rather than its gross amount.

The plaintiffs' evidence, as presented at trial through their two principal expert witnesses, and plaintiffs' arguments to the court, centered first on their contention that any disparity in the rate of return between the two rate-paying sectors of the system was unreasonable and inequitable and, therefore, in violation of the contract. Secondly, after damaging cross-examination of their expert witness,[11] plaintiffs argued that, even if a disparity per se is not unreasonable, one that amounts to subsidy of one rate payer by another is unreasonable.[12]

Reasonableness of the rate of return as depen-

[11] See n 17 and accompanying text.

[12] The trial judge did not directly address the subsidy issue as opposed to a differential, but did find that the out-city rate must be judged on its own merits, irrespective of the in-city rate of return. The plaintiffs abandoned the differential and subsidy issue in this appeal. With respect to the differential issue, the trial judge pointed out that the fact that the oldest (and most depreciated) components of the physical plant were used to furnish the resident users was a major factor for the negative rate of return on investment for resident users. It was also pointed out during trial that a low or negative rate of return to resident users could result from an overall system-wide rate of return that was lower than necessary.

dent upon a utility's cost of capital was discussed only in response to defense counsel's cross-examination. When pressed as to the basis of establishing a reasonable rate of return to the out-city users under the utility basis, each witness did on at least one occasion say it would depend on an analysis of the components of the capital structure.

Specifically, it was not until plaintiffs' expert's rebuttal testimony that he expressed an opinion, on direct examination and over defense counsel's objection, regarding the reasonableness of the suburban rate of return with reference to the cost of capital. At that point, he opined that a reasonable rate must be related to the cost of attracting capital. He testified that the city was paying 4.5 percent on the remaining debt on a bond issue offered in 1971 (the embedded interest rate). He indicated that the difference between that rate—the cost of debt—and the 9.48 percent rate of return, about five percent, was too much.

A year after all the testimony had been taken,[13] plaintiffs' counsel argued for the first time, at closing argument, that the "cost of capital" method had to be employed, saying "[n]ow if you are going to develop it [the utility-basis method] independently for outside city customers but doing it properly, you've got to look at cost of capital." Plaintiffs' counsel went on to argue that the city was favored with low interest on municipal bonds, which is a major part of the defendant's capital structure and, when that is considered, a nine

---

[13] This one-year delay was caused by an apparent lack of cooperation on the part of the court reporter. Because the reporter failed to supply the transcript of the trial proceedings within the time agreed upon, the judge was forced to find the reporter in contempt of court, after having issued a bench warrant on March 5, 1981, to obtain his appearance in court. The transcript eventually supplied was, according to the trial judge, "abysmal, containing numerous errors."

percent return on the total capital investment is not reasonable.

The trial court did not comment on the cost-of-capital argument and entered a judgment of no cause of action.

Relying on the testimony of plaintiffs' expert on cross-examination, the trial judge found that the 9.8 percent rate of return projected by that expert for one of the years in question was not, standing alone, unreasonable and that investment returns of ten percent among utilities were not unusual. Regarding the differential, the trial court found

> that the utility method of rate-making, with a differential rate of return favoring the owner-municipality, is an accepted practice in the American water industry. The method is not only judicially sanctioned in Michigan, but a differential rate of return on net capital investment favorable to the owner-municipality has been approved (1) as a matter of implied contract, *Detroit v Highland Park*, [326 Mich 78; 39 NW2d 325 (1949)], (2) in the interpretation of contracts calling for reasonable rates, *Oakland County v Detroit*, 81 Mich App 308 [265 NW2d 130] (1978), and (3) under contracts using language identical to that appearing in the contracts of many of the plaintiffs herein under which rates are to be "reasonable in relation to the costs incurred by the city for the supply of water," [*Meridian Twp v East Lansing*, 342 Mich 734; 71 NW2d 234 (1955)].

As a rationale for his decision, the trial judge emphasized the posture of this case by quoting from our opinion in *Meridian Twp, supra*, p 752:

> It would serve no useful purpose to discuss further, in this opinion, either the elaborate cost and worth analyses submitted to us through the diligence of counsel, or the accounting theories

presented and argued. After all, we are not setting a rate. We are deciding merely whether a rate charged goes beyond a contract which requires that it be "reasonable in relation to the costs incurred by the city for the supply of water." As we noted, identity of rates with costs is not required. As a practical matter this would impose an impossible accounting task. The relationship need only be a reasonable one.

In the Court of Appeals, the plaintiffs renewed their argument that the approximately nine percent rate of return included in their water rates combined with the negative rate of return to the Detroit users amounted to a subsidy and was therefore unreasonable. Plaintiff also argued that the application of the utility-basis method of allocating costs required the use of the "cost of capital" method of determining a fair return.

Although the Court of Appeals agreed with the trial court that a suburban rate of return may be reasonable even if the resident customers' rate of return is less than zero, it disagreed with Judge Peterson's ultimate conclusion regarding reasonableness. It found that the trial court erred in basing its opinion "solely on the fact that regulated utilities in Michigan were allowed rates of return higher than eight percent or nine percent during the same period." *City of Plymouth v Detroit*, 130 Mich App 155, 170; 344 NW2d 291 (1983). It found that

[i]n comparing the overall rate of return in the instant case to the overall rates of return allowed regulated utilities without comparing their costs of outstanding debt and cost of attracting capital, the trial judge may well have sanctioned an unreasonably high rate of return on the equity on the suburban investment. [*Id.*]

Thus, the Court of Appeals reversed and remanded, instructing the trial court as follows:

> [F]irst ascertain the actual overall rate of return for each of the fiscal years the contested rates were in effect. The trial judge must then determine, for each of the years in question, the debt-to-net-investment ratio of the share of the system devoted to suburban use and the actual rate of return, or cost, of the debt. The actual rate of return on equity can then be determined by working backwards from the actual overall rate of return.
>
> After ascertaining the actual rate of return on equity for each fiscal year in question, it will then be necessary to determine the reasonableness of that rate of return. This can be done by comparing the rate of return on equity in the instant case with the rates of return on equity allowed other utilities with similar credit ratings during the same periods, and by ascertaining for each year the going interest rates on municipal bonds issued by municipalities with credit and bond ratings similar to the ratings of the defendant during the years in question. Rates of return on equity in extra-city shares of other water systems owned by municipalities with credit and bond ratings similar to the ratings of the defendant during the period in question would be especially useful as a guide in evaluating the reasonableness of the rate of return in the instant case.
>
> Finally, should the trial judge conclude that the rate of return on equity is unreasonable, the judge will have to ascertain what reasonable rates of return on equity would be, as it appears that plaintiffs' remedy for unreasonable rates depends on the difference in cost between the rates as actually charged and reasonable rates. [*Id.*, pp 171-172.]

The Court of Appeals acknowledged,

> So far as we can determine, the cost of capital

method has never been used to determine the proper rate of return to be received by a municipally owned utility. [*Id.,* p 169.]

It also "acknowledge[d] that our resolution of this appeal will probably require an extensive evidentiary hearing and introduction of proofs not introduced at trial." The Court nonetheless expressed its belief that its disposition of the case "is necessary to achieve a reasoned result." *Id.,* p 172.

Finally, the Court of Appeals found that the applicable version of MCL 123.141; MSA 5.2581, providing that rates charged to another unit of government shall not be more than twice those charged to its own users, does not establish an outer limit of reasonableness as a matter of law where, as here, there is a contractual requirement of reasonableness.

The City of Detroit filed an application for leave to appeal in this Court, and leave was granted by order issued on May 17, 1984. 419 Mich 870 (1984). Defendant alleges that the Court of Appeals erred: in failing to apply the clearly erroneous standard of appeal to the trial court ruling; in requiring that the cost-of-capital method of determining rate of return be used when it was not properly raised below; in failing to apply the standard of reasonableness set forth in MCL 123.141; MSA 5.2581; and in improperly instructing the trial court on remand as to the specific application of the cost-of-capital method and as to all of the components of proper rate determination.

Plaintiffs respond with a different set of issues, maintaining that Detroit's authority to set rates under the contracts should not be presumed valid, that the trial court's method of applying the utility-basis method was clearly erroneous, that since Detroit requested application of the utility-basis

method, it cannot now object to the Court of
Appeals "complete" application of that theory,
that the standard of reasonableness to be applied
is contained in the contracts, and that the Court of
Appeals did not err in remanding this case to the
trial court for application of the "ordinary" utility-
basis theory and methodology to test the "fair-
ness" of the suburban rate of return.

## ANALYSIS

The major issues may be summarized as follows:
(1) Does the applicable version of MCL 123.141;
MSA 5.2581 provide the governing standard of
reasonableness? (2) Is the cost-of-capital method
required by law or should this Court require its
use in this context? (3) What is the applicable
standard of review, and on which party did the
burden of proof lie?

### I

We must first respond to the city's claim that
the relevant version of MCL 123.141; MSA 5.2581
represents the only applicable standard of reason-
ableness. That statute provided that the city may
charge its outlying customers not more than twice
what it charges its own users, except where "the
water is delivered [to a community] lying more
than ten miles beyond [the selling city]" and that
"any price charged that is more than double shall
bear a reasonable relationship to the services ren-
dered." Appellant maintains that since the subur-
ban rates in this case are not more than double
the city rate, they are reasonable per se. By mak-
ing reasonableness a test only when the out-city
rates are more than double the resident rates,
appellant contends that the Legislature considered
any rate less than that amount to be reasonable.

As support for this position, appellant cites *Me-*

*ridian Twp, supra.* In that case, Meridian Township sued to enjoin the City of East Lansing from charging and collecting increased water rates, alleging that such increased rates were not reasonable in relation to the costs incurred by East Lansing in supplying the water, as required by the contract between the parties. The rate increase in question in that case effectively resulted in rates charged to Meridian which were 187 percent of those charged to customers in East Lansing.

MCL 123.141; MSA 5.2581, at the time of *Meridian Twp,* did not include townships within its purview; therefore, it was held to be inapplicable to that case. However, this Court

> note[d] in passing, that the Michigan legislature has clearly, with respect to cities and villages, resolved the competing considerations of exhorbitant rates versus fair profits in [MCL 123.141; MSA 5.2581], by providing that the rate charged such outside municipalities shall not be more than double the rate paid by consumers within their own territory. [*Meridian Twp, supra,* p 748.]

Relying on this dictum, appellant argues that, as to cities and villages, "the *Meridian Township* Court interpreted MCL 123.141 [MSA 5.2581] as having 'clearly . . . resolved' the question of reasonableness as a matter of law." Appellees counter that the statute only provides for a statutory floor and ceiling of reasonableness and that the specific provisions of the contracts between the parties govern their relationship.

The Court of Appeals agreed with the plaintiff cities, holding

> that the statute does not render reasonable as a matter of law rates within its maximum and mini-

mum provisions in the face of a contractual provision which states that rates shall be reasonable in relation to costs. Regardless of how the statute reads, defendant has limited its discretion in setting rates by agreeing to the contractual provision. [*City of Plymouth, supra,* p 161.]

The Court of Appeals noted that *Meridian Twp* "did not hold that the statutory provision would have taken precedence over the contractual provision had the statute applied to townships." *Id.*

We find the response of the Court of Appeals to be eminently logical. First, the dictum in *Meridian Twp* does not purport to address itself to the real issue of this case, *viz.,* does the statute govern over a specific contract, even though the contract in that case did contain a similar reasonableness provision. The *Meridian Twp* Court simply did not need to address the question. Secondly, the purpose of the quoted *dictum* was to note that the "statute, even if applicable, . . . has not been offended." *Id.,* p 160. It was merely additional support for the conclusion, after a comprehensive analysis of the cost computations, that the rates were not unreasonable. Finally, if appellant's view were adopted, it would take away a major element of the right to contract which was granted to municipal corporations under MCL 123.141; MSA 5.2581.[14]

---

[14] MCL 123.141; MSA 5.2581 has since been amended to provide:

"(2) The price charged by the city to its customers shall be at a rate which is based on the actual cost of service as determined under the utility basis of rate-making. This subsection shall not remove any minimum or maximum limits imposed contractually between the city and its wholesale customers during the remaining life of the contract. This subsection shall not apply to a water system that is not a contractual customer of another water department and that serves less than 1% of the population of the state. This subsection shall take effect with the first change in wholesale or retail rate by the city or its contractual customers following the effective date of this subsection." 1981 PA 89.

## II

Since we do not find the water rate to be reasonable as a matter of statutory law, we next address the Court of Appeals finding that a determination of the reasonableness of a rate of return under the utility-basis method cannot be made without application of the cost-of-capital method. We do not agree with the conclusion that the cost-of-capital methodology is required.

As previously noted, the cost-of-capital method requires the weighting of "the costs of each component of capital . . . according to the ratio each bears to the total capital structure of the utility and the resultant figures are added together to yield a sum which represents the overall rate of return." *City of Plymouth, supra,* p 167. While acknowledging that "the cost of capital method has never been used to determine the proper rate of return to be received by a municipally owned utility," *id.,* p 169, the Court of Appeals found it to be "a widely accepted method of determining the overall rate of return to be allowed a public utility," *id.,* p 167, and held that it was error for the trial judge not to consider separately the return on equity on the suburban investment. *Id.,* p 170. The Court instructed that the proper means of assessing reasonableness of return on equity was to determine the rate of return on equity received by other utilities with similar credit ratings during the same period and to ascertain "the going interest rates on municipal bonds issued by municipalities with credit and bond ratings similar to the ratings of the defendant during the years in question." *Id.,* p 172.

The Court of Appeals was correct in its statement of the law when it opined, the "cost of capital method has never been used to determine the proper rate of return to be received by a

municipally owned utility." *City of Plymouth, supra,* p 169. In *Meridian Twp, supra,* where we dealt with the interpretation of a nearly identical "reasonable" clause in a contract whereby East Lansing supplied water to Meridian Township, we upheld as reasonable an East Lansing ordinance providing that the rate for out-city users would be 150 percent of the rate for the resident users. We noted in that case that the term reasonable must be construed with reference to the facts.

> We are asked by the appellant to find that the rate charged is not reasonable as above prescribed. It will be noted that the clause under examination does not equate rates to costs. Identity is not required. Obviously there is elbowroom for adjustment. The requirement merely is that they shall be "reasonable" in relation to costs. The word "reasonable" with respect to rates charged by utilities is a word of the most universal employment. . . . The determination of its meaning, in any case, is not subject to mathematical computation with scientific exactitude but depends upon a comprehensive examination of all factors involved, having in mind the objective sought to be attained in its use. Here it is related to the costs incurred by the city in the supply of water. [*Id.,* p 749.]

Moreover, a question regarding the reasonableness of a rate of return, generally, is considered by courts to be one of fact. While no court has explicitly required or rejected the cost-of-capital method in a municipal context, the cases employing a cost-of-capital approach to a rate of return issue stress that reasonableness of return is a question of fact.

In *United Gas Pipe Line Co v Louisiana Public Service Comm,* 241 La 687, 702; 130 So 2d 652 (1961), the court noted that "[i]n a very real sense, the problem of a fair return is one of economics."

Quoting *Southern Bell Telephone & Telegraph Co v Louisiana Public Service Comm*, 239 La 175, 225; 118 So 2d 372 (1960), that court further observed:

"The ascertainment of a fair return in a given case is a matter incapable of exact mathematical demonstration. *It is one of reasonable approximation having its basis in a proper consideration of all relevant facts.*"

\* \* \*

*The question of what constitutes a reasonable return is one of fact rather than of law.* It requires the application of an enlightened judgment to the multiplicity of variables disclosed by the evidence. [*United Gas Pipe Line, supra*, pp 704-705. Emphasis added.]

The court in *In re Hawaii Electric Light Co, Inc,* 60 Hawaii 625, 636; 594 P2d 612 (1979), expressed the same view:

Questions concerning a fair rate of return are particularly vexing as the reasonableness of rates is not determined by a fixed formula but is a fact question requiring the exercise of sound discretion by the Commission. [Cites omitted.] It is often recognized that the ratemaking function involves the making of "pragmatic" adjustments and that there is no single correct rate of return but that there is a "zone of reasonableness" within which the commission may exercise its judgment. [Citations omitted.]

Accord *Alabama Gas Corp v Wallace*, 293 Ala 594, 602; 308 So 2d 674 (1975). "The determination of a fair return to provide the public with adequate service is a question of fact within the legislative realm of rate making." The United States Supreme Court in *Federal Power Comm v Hope*, 320 US 591, 602; 64 S Ct 281; 88 L Ed 333 (1944), held

that the [Federal Power] Commission was not

bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of "pragmatic adjustments." . . . Under the statutory standard of "just and reasonable" *it is the result reached not the method employed which is controlling.* . . . It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. [Emphasis added.]

Relying on the facts presented at trial in this case, the trial judge found the rate of return to be not unreasonable. We find no clear error in that conclusion.

The Court of Appeals was also correct in stating that the cost-of-capital method was "a widely accepted method of determining the overall rate of return to be allowed a public utility." *City of Plymouth, supra,* p 167. However, that can be said only in the case of *regulated* utilities, where it is the responsibility of a public agency to set rather than review a rate. See, *e.g., Hope, supra; Bluefield Water Works & Improvement Co v Public Service Comm,* 262 US 679; 43 S Ct 675; 67 L Ed 1176 (1923); *Washington Gas Light Co v Public Service Comm,* 450 A2d 1187 (DC, 1982); *Hawaii Electric Co, Inc, supra; Alabama Gas Corp, supra; United Gas Pipe Line Co, supra; Sun City Water Co v Arizona Corp Comm,* 26 Ariz App 304; 547 P2d 1104 (1976). The case law dealing with the cost-of-capital method finds the courts reviewing the application of the cost-of-capital method as it was applied by the regulatory rate-setting body. In that sense, the Court of Appeals and appellees are correct that it is a common way of calculating a rate of return; however, it is by no means re-

quired, and we decline to establish such a requirement in this case.[15]

We think it obvious that a cost-of-capital approach, had it been utilized by the parties in this case, would have been more revealing of the exact

[15] Where the cost-of-capital method is utilized, it does not bring certitude or ease of application. It will be recalled that the appellees are arguing that Detroit's debt is unusually low. They maintain that when the debt portion of the capital structure was extrapolated from the overall approximately nine percent rate of return for one of the years in question, an approximately fifteen percent return in the equity portion of defendants' capital structure resulted. Because the trial judge in this case used the overall rate of return on capital, it was only necessary to compare the overall rate of return on the capital of other utilities. The trial judge found that the overall rate of return of between eight and nine percent was not unreasonable. The judge noted that the plaintiffs' own expert "could not say that the rate he projected for his 1977 test year, 9.8%, was unreasonable."

However, once the capital structure is broken down into debt and equity, new questions arise. Cost of debt is easy to determine because of its contractual nature. Cost of equity, however, is a different matter and one that has given reviewing courts some difficulty.

The Louisiana Supreme Court, in a rate-making case which applied the cost-of-capital method, observed:

"The most serious controversy in this case involves the rate of return on common equity. Unlike debt capital, there is no contractual basis for ascertaining its cost." *United Gas Pipe Line Co, supra,* p 707.

Likewise, the Arizona Court of Appeals noted,

"The cost of equity capital is not capable of such mathematical precision and in fact is a judgment call, enlightened by consideration of all the relevant factors." *Sun City Water Co, supra,* p 309.

The same court reiterated,

"the determination of a rate of return which includes a cost of equity factor, is not a precise science, and . . . reasonable men may differ . . . ." *Id.,* p 309.

The Court of Appeals in this case also acknowledged,

"Determination of the rate of return on equity, however, is not capable of such mathematical precision and therefore provides the primary controversy in many utility rate cases. [Citations omitted.]

"In such cases, the reasonableness of the overall rate of return depends largely upon the reasonableness of the return on equity." *City of Plymouth v Detroit, supra,* p 168.

nature of the city's rate of return. What is not obvious is whether such an approach would have been more helpful in determining the ultimate question at issue, the reasonableness of the rate of return. If, *arguendo,* after breaking down the components of the out-city share of capital, the rate of return on equity was to be revealed to be fifteen percent, how should its reasonableness be determined?

Aside from the technical difficulties of determining the cost of equity and the questionable applicability of the cost-of-capital method to the issue presented, its use would also require closer scrutiny of several policy questions. If, as it can be assumed, a municipality has a lower cost of debt because of the tax advantages of municipal bonds and the security of full faith and credit financing, where utilized, should the municipality be able to use this advantage over a private utility? Should it be able to do this by receiving a higher rate of return on its equity component of capital so long as its overall rate of return on capital does not exceed that of an otherwise comparable utility?

On the other side of the coin, should the city be held to a lower rate of return on equity because it does not need to issue and sell stock, and, as defendant points out, its investors are captive (the taxpayers of the owner city)? We touched on these policy questions in *Meridian Twp, supra,* p 747 (citing Note, *Rate discrimination in sale of water service to non-residents,* 101 U Pa L R 160, 162 [1952]).

> "A city's purchase of a utility plant is made on behalf of its citizens, who then become both consumers and owners. The requirement of serving nonresidents at the same rates as residents partly defeats the purpose of the purchase by decreasing

the benefit derived from the resident consumers' ownership. Utility service is only one phase of a prevalent situation in which nonresidents adjacent to cities enjoy the economic and other advantages of city life without being subjected to all the responsibilities of citizens."

Our uncertainty about the relevant merits of requiring the cost-of-capital method to be applied to this case is further heightened by questions raised by appellant in its critique of the Court of Appeals remand order. The appellant argues that equity, as opposed to net investment, represents a utility's net worth, or the amount by which the utility's assets exceed its liabilities; equity is therefore incapable of apportionment between customer classes of the system. The appellant also argues that the Court of Appeals, in requiring on remand that Detroit's return on equity be limited to the current rate paid on municipal bonds, seriously misunderstood the different risks and, therefore, the different costs, of attracting debt and equity capital.[16]

Thus, in light of the foregoing considerations, we cannot agree with the Court of Appeals conclusion that the cost-of-capital method should be required as a matter of law in cases involving an assessment of the reasonableness of a rate of return associated with a challenged municipal water rate. Because the cost-of-capital method has not heretofore been applied to review the reasonableness of a rate of return of a municipally owned utility does not mean that it could or should not be utilized. In

---

[16] Because we do not agree with the Court of Appeals conclusion that the cost-of-capital method must be applied in this case, we do not reach the question how it should be applied. In any case, it is not possible for us to answer these questions about the cost-of-capital method, or to even say that they are answerable in the context of this case, because an evidentiary base for the method's application was not established in the trial court.

application, it may prove superior. This is far different, however, from saying, as the Court of Appeals in effect said, that this method must be applied in order to determine the reasonableness of the rate of return. On the basis of the foregoing analysis, we find no legal or factual basis for such a conclusion.

### III

Having determined that the cost-of-capital method is not required in order to determine reasonableness, we lastly consider the issues of the burden of proof and standard of review.

The two issues are related. The trial court, relying on *Meridian Twp, supra,* and *Highland Park, supra,* held

> that the fixing of such rates is a legislative matter with which the courts will not interfere unless the *plaintiff shows* that the rate determination was arbitrary, capricious or unreasonable. [Emphasis added.]

The Court of Appeals did not explicitly address the issue, but noted with approval the trial judge's citation of *Highland Park* for the rule that

> the setting of rates is a legislative matter and that the courts will not interfere unless the rate is arbitrary, capricious, or unreasonable. [*City of Plymouth, supra,* p 158.]

Thus, the Court of Appeals appears to have sidestepped the burden of proof issue by eliminating the "unless the plaintiff shows" language from its summary of the *Highland Park* standard as articulated by the trial judge. In *Highland Park,* where a contract for sewage rates was implied, we held:

> The rate lawfully established by [Detroit] is
> *assumed to be reasonable* in absence of a showing
> to the contrary or a showing of fraud or bad faith
> or that it is capricious, arbitrary or unreasonable,
> *and the burden of proof is on [Highland Park] to
> show that the rate is unreasonable.* [*Highland
> Park, supra,* pp 100-101. Emphasis added.]

Likewise, *Meridian Twp,* p 753, articulated the
same rule:

> The burden of proof was on the plaintiff to show
> that the rates charged were, in fact, unreasonable
> with relation to costs.

Thus, we find no basis for the appellees' contention
that the burden lay on the defendant city to show
reasonableness.

We find that the burden lay on the plaintiffs and
that they failed to meet that burden by showing
that the rate was arbitrary, capricious, or unrea-
sonable. In the absence of such a showing, the
Court of Appeals erred in its interference with the
ratemaking in question.

The Court of Appeals stated:

> Although none of the experts put it into words,
> ostensibly because none of them were asked to,
> they were saying that the reasonableness of the
> rate of return could be evaluated by employing the
> cost of capital method. It was not until the rebut-
> tal testimony of Mr. Gillett, plaintiffs' rate-making
> expert, that plaintiffs' counsel sought to elicit
> evidence of the capital costs of the system. [*City of
> Plymouth, supra,* p 169.]

It is certainly true that not until rebuttal testi-
mony of the plaintiffs' principal witness did plain-
tiffs' counsel attempt to elicit an assertion that a
breakdown of the components of the capital struc-
ture produced a way to arrive at the reasonable-

ness of the rate of return on capital.[17] After review

[17] The plaintiffs' late interest in putting something on the record regarding the cost of capital was probably prompted by defendant's cross-examination of plaintiffs' principal witness. In answer to a question about a reasonable return, the witness answered:

[Testimony of Mr. Gillett]:

"*A.* I don't have enough information to say whether or not a privately owned utility should earn 9.8 percent. First, I'm out of my area of knowledge when I start talking about what proper rates of return are. In terms of percentages, a return on capital, it depends on many things; the debt structure; the need to attract new capital, if the system is expanding. I don't think I can give an answer to that. 9.8 percent is not an unreasonable return for electric utilities and others. We're not talking of a private utility with stock. We're talking of a publicly owned municipal system with tax free bonds."

A week later, when this witness, on rebuttal, attempted to furnish for the first time some information about the city's low embedded cost of debt and to conclude therefrom (although tentatively) that the rate of return may be too high, the defendant, on cross-examination, elicited the following:

"*Q.* In this rate study there's a range of reasonableness within, which you would expect three or four different people to come in?

"*A.* That's correct.

"*Q.* And, isn't where we end up here is that what you don't like and haven't liked all along is that the differential may result in a negative return inside?

"*A.* I think that's the gut issue.

\*   \*   \*

"*Q.* Now, let's just look at the 9 percent return to outsiders alone. Now, this business about what the city's embedded interest rate was, was available to you in July of 1979, wasn't it?

"*A.* Uhmm, yes, it was.

"*Q.* Was it available to you in October when your deposition was taken?

"*A.* Yes, it was.

"*Q.* Was it available in December when you made your report?

"*A.* Yes.

"*Q.* It was available when you testified last week?

"*A.* That's right.

"*Q.* And after working on it for some three or four months, whatever you did, when you testified at your deposition you testified, did you not, that standing alone you could not say that 9 percent was an unreasonable rate of return for suburban customers?

"*A.* I believe I said that, yes.

"*Q.* Okay. And, then when you filed your report, referring to Exhibit P1 on page 22, under your heading 'Financing,' you said as follows, didn't you: 'We cannot comment on a proper rate or rates of return.' Isn't that right?

"*A.* That's correct.

"*Q.* And that was true when you said it then, wasn't it?

of the extensive trial court records, we are convinced it is also certainly true that at no time did plaintiffs produce or attempt to produce the evidentiary basis necessary to examine the individual components of the capital structure of defendant's system. It is also obvious from that review that the thrust of the plaintiffs' case in chief was that the difference in rates between the resident and out-city users resulted in an unreasonable water rate, an argument that appellees have now abandoned on review. The plaintiffs' pleadings, proposed findings of fact, and conclusions of law (submitted to the trial court after the close of the taking of testimony), testimony, and argument, except for the rebuttal testimony of one witness and counsel's comments in his closing argument, did not mention the need for a cost-of-capital analysis. Moreover, the lack of adequate proof at trial was acknowledged by the Court of Appeals. It noted that "our resolution of this appeal will probably require an extensive evidentiary hearing and introduction of proofs not introduced at trial." *Id.,* p 172.

Having decided that the cost-of-capital method is not required, the effect of the Court of Appeals decision, if left to stand, would be to place on the trial court, rather than on the plaintiff, the burden of assuring that the evidence includes sufficient information to support whatever theory the plaintiff might advance for the first time at closing argument. This violates the standard clearly set forth in *Highland Park* and *Meridian Twp, supra.*

"*A.* Yes.

"*Q.* Is it true now?

"*A.* It's still true.

"*Q.* Okay. And that's still your testimony; that you cannot comment on a proper rate or rates of return?

"*A.* It was not the purpose of this report to recommend a rate of return."

The plaintiff had ample opportunity to substantiate its claim on the theory with which it had chosen to prove that the rates in question were violative of the contract between the parties. The trial court concluded that the rates charged had not been shown to be unreasonable. We find no error in the trial court's conclusion. We hold that the Court of Appeals erred in finding that the cost-of-capital method was required in order to determine reasonableness and, accordingly, also erred in affording the plaintiff an opportunity to retry its case on a theory not sufficiently advanced at trial.

The judgment of the Court of Appeals is reversed, and the judgment of the trial court is reinstated.

WILLIAMS, C.J., and LEVIN, RYAN, CAVANAGH, BOYLE, and RILEY, JJ., concurred with BRICKLEY, J.